**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STERLING FEDERAL BANK, F.S.B., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 C 6904 |
| | ) | |
| DLJ MORTGAGE CAPITAL, INC., BANK | ) | |
| OF AMERICA, N.A., SELECT PORTFOLIO | ) | |
| SERVICING, INC. and THE BANK OF | ) | |
| NEW YORK MELLON CORP., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Before the court is defendants' motion to dismiss plaintiff's complaint. For the reasons explained below we grant defendant's motion.

**BACKGROUND**

In separate transactions during December 2002 and May 2003 plaintiff Sterling Federal Bank, F.S.B. ("Sterling") purchased mortgage-backed pass-through certificates on the secondary market for approximately $6.5 million. (See Compl. ¶ 11; id. at n.1.)[1]

---

[1]/    The terms governing the two "Certificate Series" at issue in this case — 2002-22 (purchased by Sterling on December 29, 2002) and 2002-24 (purchased on May 27, 2003) — are substantially similar. For ease of reference we will follow the parties' lead and refer to documents concerning Series 2002-24 except as otherwise noted. The principal documents are: (1) the Prospectus Supplement, dated August 28, 2002, attached as Ex. B to Sterling's Complaint ("Prospectus Supp. (2002-24)"); and (2) the Pooling and Servicing Agreement, dated August 21, 2002, attached as Ex. 1 to the defendants' memorandum of law in support of their motion to dismiss ("PSA (2002-24)"). Sterling attached the PSA for the 2002-22 transaction to its complaint, but not the PSA for the 2002-24 transaction. That appears to have been an oversight. (See Compl. ¶¶ 15, 17

These certificates entitle their holders to periodic principal and interest payments funded by payments by borrowers from "pools" of sub-prime home mortgage loans. (Id. at ¶ 12; see also Prospectus Supp. (2002-24) at S-10.) The complaint alleges that the Series 2002-22 and 2002-24 certificates were collateralized by pools of 3,318 mortgage loans (aggregate principal balance: $569,444,524) and 1,794 mortgage loans (aggregate principal balance: $393,080,111), respectively. (Compl. ¶ 12 n.2.) Credit Suisse First Boston Mortgage Corp. ("CSFB Mortgage") purchased the underlying mortgage loans from sellers including defendants DLJ Mortgage Capital, Inc. ("DLJ"), an affiliate of CSFB Mortgage. (Prospectus Supp. (2002-24) at S-21.) DLJ purchased the loans it sold to CSFB Mortgage from "various mortgage loan originators and purchasers" including, with respect to the 2002-24 transaction, defendant Bank of America, N.A. ("BOA"). (Id.) CSFB Mortgage (as the "depositor") conveyed the mortgages to trusts created specifically for these transactions, in return for which CSFB Mortgage received certificates evidencing various interests in the trusts. (See PSA (2002-24) §§ 2.01, 2.06.) CSFB Mortgage sold the certificates to its affiliate Credit Suisse First Boston Corp. (as underwriter), who then resold them to initial investors.

---

(referring to that document as though it had been attached).) For purposes of defendants' motion we will treat the PSAs as part of Sterling's complaint. Fed. R. Civ. P. 10(c); see also Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc., 474 F.3d 463, 466 (7th Cir. 2007).

(Prospectus Supp. (2002-24) at S-94.) The certificates are divided into various classes, each with a distinct position in the hierarchy of payment. (Id. at S-10-11.) Defendants contend — and Sterling does not dispute — that Sterling purchased certificates on the secondary market in classes subordinated to virtually all other certificates in order of payment.[2]

Many mortgage-backed securities transactions have features (called "credit support" or "credit enhancement") designed "to give investors greater assurance they will receive payments on their [mortgage-backed securities]." SEC Staff Report, Enhancing Disclosure in the Mortgage-Backed Securities Markets, at Part II.C.4 (Jan. 2003), *available at* http://www.sec.gov/news/studies/mortgagebacked.htm#secii. These particular transactions were "over-collateralized," meaning that the mortgage pools were expected to generate more cash flow than the amounts needed to make payments on the certificates. (Defs.' Mem. at 6; Compl. ¶¶ 21-22.) Also, certain of the mortgage loans in the pool are covered by a mortgage guaranty insurance policy covering losses up to a maximum amount. (Compl. ¶¶ 15, 20-22; see also Prospectus Supp. (2002-24) at S-11, S-23-24.) Sterling alleges that the defendants failed to remedy mortgage defaults and failed to provide information to certificateholders and ratings

---

[2] Those classes are identified as Security 2002-22 DB1 and Security 2002-24 IB2. (Compl. ¶ 11.)

agencies that would have revealed the mortgage pools' true condition. Because of the defendants' actions the securities are no longer over-collateralized (Pl.'s Resp. at 2 n.3) and ratings agencies have substantially downgraded the certificates' investment ratings. (Compl. ¶¶ 21-22; see also id. at ¶ 15 n. 4; Prospectus Supp. (2002-24) at S-95 ("The ratings on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions on the underlying mortgage loans to which such certificateholders are entitled.").) The first six counts of Sterling's seven-count complaint allege that the defendants breached their obligations under the certificates' governing documents, the PSAs. Count VII alleges that BNYM, as trustee and "trust administrator," breached its fiduciary duties to certificateholders (including Sterling).

### 1. Count I Alleging Breach of Contract Against BOA & DLJ

DLJ and BOA, as mortgage sellers, made certain representations and warranties to CSFB Mortgage and BNYM concerning the underlying mortgage loans. (See PSA (2002-24) § 2.03 & Schedules IIIA (DLJ) & IIID (BOA).) Paragraph 26 of Sterling's complaint refers generally to "Schedules IIA, IIF, IIIA, and IIID," which contain nearly one hundred separate representations and warranties. In their opening brief defendants argue that this is insufficient to give them notice of the alleged breach. (Defs.' Mem. at 13-14.) Sterling responds that it "clearly alleges" breach of paragraph

(xii) in schedules IIIA (DLJ) and IIID (BOA). (Pl.'s Resp. at 7.) Paragraph (xii) — in which DLJ and BOA represent that they are the sole owners of the mortgage loans — is not mentioned anywhere in the complaint, either directly or indirectly. But elsewhere in the complaint Sterling refers to paragraphs (iii) (representing that there are no material loan defaults) and (xi) ("[n]o fraud, error, omission, misrepresentation, negligence or similar occurrence with respect a Mortgage Loan has taken place on the part of Seller or the Mortgagor . . . .). (Compl. ¶ 17.) We infer that Sterling alleges that DLJ and BOA breached these particular representations and warranties. Section 2.03 of the PSAs requires the sellers to cure any breach of a representation or warranty that "materially and adversely affects the interests of the Certificateholders in any Mortgage Loan" within 90 days of discovering (or receiving written notice of) such breach. (PSA (2002-24) § 2.03(c).) If the seller fails to cure the breach then it must — with an exception not applicable to the loans at issue here — "repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee." (Id.) Sterling alleges that DLJ and BOA have failed to cure or repurchase defaulted loans. (Compl. ¶ 28; Pl.'s Resp. at 13 n.8.)

**2. Counts II, III, and IV Alleging Breach of Contract Against Select Portfolio Servicing, Inc. ("SPS").**

Under the PSAs defendant SPS (as "Servicer") collects payments and performs other administrative activities with respect to the loans. (Compl. ¶ 8; <u>see generally</u> PSA (2002-24) Article III

("Administration and Servicing of Mortgage Loans").) Sterling alleges that SPS failed to pursue claims for insurance coverage regarding the mortgage loans (see PSA (2002-24) § 3.09) and failed to foreclose on delinquent loans (see id. at § 3.11). (Compl. ¶¶ 33-34 (Count II).) SPS also failed to provide defendant Bank of New York Melon ("BNYM," as trustee) with "complete and accurate information" concerning the mortgage loans in breach of PSA §§ 2.07(m) and 3.07(a). (Id. at ¶¶ 38-39 (Count III).) Finally, Sterling alleges that SPS failed to "enforce" DLJ's and BOA's obligations to cure or repurchase defaulted loans. (Id. at ¶¶ 43-46 (Count IV).)

### 3. Counts V, VI, and VII Alleging Breach of Contract and Breach of Fiduciary Duty Against BNYM.

BNYM, as the successor in interest to Bank One, National Association (see Defs.'s Mem. at 7 n.8), serves as the trustee and "Trust Administrator" with respect to the transactions. Sterling contends that BNYM breached PSA § 12.05 by failing to provide ratings agencies with information concerning the mortgage loans. (Compl. ¶¶ 50-51 (Count V).) Sterling further alleges that BNYM violated PSA § 4.04 by failing to provide "full and accurate information" to certificateholders regarding claims submitted under the mortgage guaranty insurance policy. (Id. at ¶ 55 (Count VI).) Finally, Sterling alleges that BNYM breached its fiduciary duties to certificateholders (including Sterling) by "failing to enforce the terms of the [PSAs]." (Id. at ¶ 67 (Count VII).)

Specifically, Sterling alleges that BNYM "had a duty to seek data from SPS as to the number of and status of Triad insurance claims, particularly Triad claim denials." (Id. at ¶ 62.)

## DISCUSSION

### A. Standard of Review

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356, at 354 (3d ed. 2004). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 556 (2007)). When evaluating a motion to dismiss a complaint, we must accept as true all factual allegations in the complaint. Iqbal, 129 S. Ct. at 1949. However, we need not accept as true its legal conclusions; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555).

### B. Dismissal for Noncompliance with the No-Action Clause

Defendants do not dispute that Sterling, as a certificateholder, is a third-party beneficiary of PSAs with the right to enforce those agreements. However, the PSAs impose restrictions on such suits:

> No Certificateholder shall have any right by virtue or by availing itself of any provisions of this Agreement to institute any suit or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trust Administrator a written notice of an Event of Default and of the continuance thereof, as provided herein, and unless the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates shall also have made written request upon the Trust Administrator to institute such action, suit or proceeding in its own name as Trust Administrator hereunder and shall have offered to the Trust Administrator such reasonable indemnity as it may require against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trust Administrator for 60 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding; it being understood and intended, and being expressly covenanted by each Certificateholder with every other Certificateholder and the Trust Administrator, that no one or more Holders of Certificates shall have any right in any manner whatever by virtue or by availing itself or themselves of ay provisions of this Agreement to affect, disturb or prejudice the rights of the Holders of any other of the Certificates, or to obtain priority or preference to any other such Holder or to enforce any right under this Agreement, except in the manner herein provided and for the common benefit of all Certificateholders.

(PSA (2002-24) § 12.07.) So-called "no action" clauses like § 12.07 are a common feature of bond indentures. They "protect against the exercise of poor judgment by a single bondholder or a small group of bondholders, who might otherwise bring a suit against the issuer that most bondholders would consider not to be

in their collective economic interest." Feldbaum v. McCrory Corp., Civ. A. Nos. 11866, 11920, 12006, 1992 WL 119095, *6 (Del. Ch. June 2, 2002) (quoting Commentaries on Indentures, § 5.7, at 232 (1971)). Courts "strictly construe" such clauses. Cruden v. Bank of N.Y., 957 F.2d 961, 968 (2d Cir. 1992) (applying New York law).[3] Sterling "generally" alleges that "all conditions precedent have occurred or been performed," see Fed. R. Civ. P. 9(c), and argues that this is sufficient to satisfy the no-action clause at the pleading stage. (Pl.'s Resp. at 8.) But Sterling cannot allege something it knows to be untrue (see Fed. R. Civ. P. 11(b)), and it admits that it has *not* complied with § 12.07. (Id.) Nevertheless, it contends that we should excuse its failure to comply with the no-action clause.

Courts construing New York law have not applied no-action clauses to bondholder claims against indenture trustees. See Cruden, 957 F.2d at 968 (concluding that it would be "absurd" to ask the trustee to sue itself); see also Peak Partners, LP v. Republic Bank, 191 Fed.Appx. 118, 126 n.11 (3d Cir. 2006) (applying Cruden in a case involving mortgage-backed securities: "[t]he District Court also held, and we agree, that Peak was not required to comply with the no-action clause with regard to its suit against U.S. Bank because it would have required U.S. Bank, in effect, to sue itself.") (internal quotation marks omitted). Section 12.07 is not by its own terms limited to lawsuits filed against any

---

[3] The PSAs are governed by New York law. (See PSA (2002-24) § 12.03.)

particular party, but then neither was the no-action clause in
Cruden.  Indeed, the language of the two provisions is remarkably
similar and defendants have not attempted to distinguish Cruden.
We conclude that Sterling is excused from demanding that BNYM sue
itself.  See Peak Partners, 191 Fed.Appx. at 126 n.11.  Defendants
effectively concede this point, but argue that we should not excuse
Sterling from complying with § 12.07's other requirements,
including the obligation to obtain the endorsement of "Holders of
Certificates evidencing not less than 25% of the Voting Rights
evidenced by the Certificates."  (Defs.' Reply at 5.)  Defendants
have not cited any authorities that support parsing the no-action
clause's requirements in this fashion.  And by implication, at
least, the authorities they rely upon have rejected that approach.
See Cruden, 957 F.2d at 968; Peak Partners, 191 Fed.Appx. at 126
n.11.  We conclude that Sterling is excused from complying with the
no-action clause with respect to its claims against BNYM.

Sterling argues that we should also excuse compliance with §
12.07 concerning its claims against DLJ, BOA, and SPS.  First, we
conclude that Sterling's claims against these parties fall within
the no-action clause's broad language.  See Feldbaum, 1992 WL
119095, *7 ("Courts have implicitly concluded that [no action
clauses] appl[y] equally to claims against non-issuer defendants as
to claims against issuers"); see also Peak Partners, 191 Fed.Appx.
at 127 (applying a no-action clause to a claim against the
servicer, but not to claims against the trustee, in a mortgage-

backed securities transaction). It is true, as Sterling points out (Pl.'s Resp. at 9 n. 6), that "Events of Default" are defined solely with respect to SPS's duties under PSAs. (PSA (2002-24) § 8.01.) But given § 12.07's breadth — restricting "*any* suit or proceeding in equity or at law upon or under or with respect to [the PSAs]" — we do not believe that the clause can be read to apply only to claims against SPS (or to claims specifically seeking damages caused by Events of Default). See Feldbaum, 1992 WL 119095, *7. Nevertheless, Sterling argues that "BNYM has abdicated its roles as a protector of the interests of Sterling in such a fashion that the no-action clause should not be enforced," (Pl.'s Resp. at 9), citing Rabinowitz v. Kaiser-Frazer Corp., 111 N.Y.S.2d 539 (N.Y. Sup. Ct. 1952). The plaintiff in Rabinowitz was a bondholder owning less than one-eighth of 1% of the issuer's outstanding bonds. Id. at 544. The court concluded that, notwithstanding a no-action clause requiring that 25% of bondholders request that the trustee bring suit, the plaintiff had standing to sue the trustee, the issuer, and the issuer's successor-in-interest. Id. at 547. The court reasoned that the plaintiff had sufficiently alleged a conflict of interest that excused compliance with the no-action clause, noting that the trustee had made loans to the issuer that were "enmeshed" with transaction that allegedly caused the bondholders' loss. Id. at 546.

Sterling alleges that BNYM has a conflict of interest because it "regularly acts and is appointed as a trustee for CSFB issued securities" and earns "trustee fees and other benefits" in that capacity. (Compl. ¶¶ 65-66.) If this is a conflict of interest, then it is inherent in the office of trustee as defined in the PSAs. Courts applying New York law have rejected lawsuits against indenture trustees predicated on similar allegations. See In re E.F. Hutton Southwest Properties II, Ltd., 953 F.2d 963, 972 (5th Cir. 1992) ("A mere hypothetical possibility that the indenture trustee might favor the interests of the issuer merely because the former *is* an indenture trustee does not suffice.") (citing Elliott Associates v. J. Henry Schroder Bank & Trust Co., 838 F.2d 66, 71 (2d Cir. 1988)). We are not persuaded that a New York court would apply a less demanding standard where, as here, an investor is seeking to avoid a no-action clause. Cf. In re E.F. Hutton Southwest Properties II, Ltd., 953 F.2d at 972 (construing New York law to require "a clear possibility" of a conflict of interest, "e.g., where the indenture trustee is a general creditor of the obligor, who is in turn in financial straits"); Rabinowitz, 111 N.Y.S.2d at 546 (alleging that the trustee was a general creditor of the issuer). Indeed, if we accepted Sterling's argument no-action clauses would rarely (if ever) play a role in bondholder litigation. Nor are we persuaded that the no-action clause should be set aside because BNYM has not responded to Sterling's requests for information regarding claims submitted under the mortgage

guaranty insurance policy. (Compl. ¶¶ 55, 70.) There is an important difference between asking the trustee to sue itself — an "absurd" requirement that we presume the parties did not intend — and asking it to sue a third party, even when the investor alleges wrongdoing by the trustee. Sterling's recourse in the event that the trustee refuses to pursue a claim is set forth in the PSA itself: if the other prerequisites are satisfied, and the trustee "neglect[s] or refuse[s]" to file a lawsuit for any reason, certificateholders may proceed without the trustee's consent. (PSA (2002-24) § 12.07.) We conclude that Sterling's futility argument does not excuse compliance with the no-action clause as to its claims against DLJ, BOA, and SPS.[4] As we have already indicated, Sterling admits that it has not even attempted to comply with § 12.07. Accordingly, we dismiss Counts I, II, III, and IV of Sterling's complaint without prejudice.

## C.  Whether Sterling's Claims Against BNYM are Derivative

Defendants contend that Sterling cannot maintain a direct action because the complaint alleges an injury — diminished "credit support" stemming from mismanagement of loans in the mortgage pools — affecting the trusts as a whole. See <u>Dallas Cowboys Football Club, Ltd. v. National Football League Trust</u>, No. 95 CIV. 9426 (SAS), 1996 WL 601705, *2-4 (S.D.N.Y. Oct. 18, 1996) (dismissing

---

[4]  We are aware that the court in <u>Sterling Fed. Bank, F.S.B. v. Credit Suisse First Boston Corp.</u> ("Sterling I"), No. 07-C-2922, 2008 WL 4924926, *11 (N.D. Ill. Nov. 14, 2008) reached a different conclusion on similar facts. We respectfully disagree with that decision as inconsistent with the purpose of no-action clauses to protect bondholders from footing the bill for lawsuits not in their collective economic interest. See <u>Feldbaum</u>, 1992 WL 119095, *6.

direct claims filed by a single trust beneficiary against a trustee for breach of duties owed to all trust beneficiaries).  And because the claim is derivative Sterling's complaint should be dismissed for failing to satisfy Rule 23.1's pleading requirements.  <u>See</u> Fed. R. Civ. P. 23.1 (requiring the plaintiff in a derivative action to "state with particularity" its "reasons for not obtaining . . . or not making the effort" to "obtain the desired action from the directors or comparable authority").   The gist of Sterling's response is that it has been harmed in ways that are distinct from other certificateholders.   <u>See, e.g.</u>, <u>Dallas Cowboys</u>, 1996 WL 601705, *4 (concluding that the plaintiff could bring a direct claim for injuries caused by the defendant's actions directed specifically to the plaintiff).  It alludes — without any specific citations — to banking regulations making it onerous for federally chartered banks like Sterling to carry below investment-grade securities.  (<u>Id.</u>)[5]

Sterling relies heavily on the court's decision in <u>Sterling I</u>, which in turn closely followed the analysis in <u>First Bank Richmond, N.A. v. Credit Suisse First Boston Corp.</u>, No. 1:07-cv-1262-LJM-TAB, 2008 WL 4410367, *10 (S.D. Ind. Sept. 24, 2008).  In both cases the defendants argued — as the defendants do here — that the

---

[5]/   Sterling also argues, circularly, that holders of each class of certificates suffer a distinct injury by dint of owning distinct classes of certificates. (Pl.'s Resp. at 10.)  This argument is undeveloped and unsupported by any pertinent authorities.  <u>See</u> <u>United States v. Berkowitz</u>, 927 F.2d 1376, 1384 (7th Cir.1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

plaintiffs' claims were derivative because they were predicated on injury to the trusts. See Sterling I, 2008 WL 4924926, *10; First Bank Richmond, 2008 WL 4410367, *10. Without specifically addressing the direct/derivative distinction both courts analyzed the complaints' allegations under Rule 23.1(b)(3) as though the claims were derivative. Applying New York law, these courts concluded that demand was excused. See Sterling I, 2008 WL 4924926, *10; First Bank Richmond, 2008 WL 4410367, *10. We likewise conclude that it would be futile for Sterling to demand that BNYM sue itself. See Velez v. Feinstein, 87 A.D.2d 309, 317 (N.Y.App.Div. 1982) (concluding that the complaint sufficiently alleged demand futility where the trustee was controlled by the party the plaintiff sought to sue derivatively). But Rule 23.1 imposes other obligations at the pleading stage (e.g., the complaint must be verified) and beyond (e.g., a derivative action may be settled only with notice to affected stakeholders and court approval). See Fed. R. Civ. P. 23.1(b)-(c). It is important, then, to properly categorize Sterling's claims even though we have concluded that demand is excused. Sterling's claims are predicated on duties that BNYM owes to all certificateholders. See Dallas Cowboys, 1996 WL 601705, *4 ("These allegations assert the breach of a duty owed equally to all beneficiaries, and must be dismissed."); see also Feldbaum, 1992 WL 119095, *8 ("Any conduct by the issuer that violates an indenture covenant, implied or otherwise, necessarily harms all bondholders in the same manner, to

wit, through an increased risk of default and a corresponding reduction in the market value of the bonds.").  Sterling has been injured by virtue of owning interests in the trusts injured by BNYM's alleged breaches.  Even assuming that Sterling may recover from BNYM the costs of complying with federal banking regulations, its claim is still predicated on harm to the trusts.  We conclude, consistent with the implicit holding of Sterling I, that Rule 23.1 applies because Sterling's claims are derivative.  Anticipating that Sterling will refile its complaint as a derivative action, we will proceed to discuss BNYM's other challenges to Sterling's claims against it.

**D.  Whether Sterling has Stated Claims Against BNYM for Breach of Contract & Breach of Fiduciary Duty.**

*1. Breach of Contract (Counts V & VI)*

In Count V of its complaint Sterling alleges that BNYM failed to provide information to ratings agencies required by § 12.05 of the PSAs.  Sterling filed a nearly identical claim against the defendants in Sterling I, which the court dismissed for failure to state a claim.  Sterling I, 2008 WL 4924926, *14.  In its earlier complaint Sterling recited the relevant provision of the PSA, then requested relief "without any allegation that one (or more) of the five events occurred that may have triggered Bank of New York's duty to perform."  Id.  Sterling's complaint in this case adds the allegation that BNYM has breached § 12.05.  (Compl. ¶ 51.) Defendants argue that Sterling has not alleged specifically what

information it omitted and when, but we think this overstates Sterling's pleading burden. Sterling's allegation is not implausible, and it puts the defendants on notice of its claim. The same analysis applies to Sterling's claim that BNYM breached PSA § 4.04 by failing to provide certificateholders with the "number and principal amount of claims submitted under the Mortgage Guaranty Insurance Policy, as applicable." (PSA (2002-24) at Ex. U.) Defendants raise several substantive objections to Sterling's allegation, (Defs.' Resp. at 22-23), but those arguments that more appropriately raised in a motion for summary judgment. Cf. Sterling I, 2008 WL 4924926, *14 (concluding that Sterling had stated a claim for relief on similar facts).

   2.   *Breach of Fiduciary Duty (Count VII)*

Defendants maintain that Sterling's fiduciary duty claim is barred by the Section 352 of the N.Y. Gen. Bus. Law (the "Martin Act"). The Martin Act "prohibits various fraudulent and deceitful practices in the distribution, exchange, sale and purchase of securities." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 190 (2d Cir. 2001). There is no private right of action under the Martin Act, and "New York courts have determined that sustaining a cause of action for breach of fiduciary duty in the context of securities fraud 'would effectively permit a private action under the Martin Act, which would be inconsistent with the Attorney-General's exclusive enforcement powers thereunder.'" Id. (quoting Eagle Tenants Corp. v. Fishbein, 182 A.D.2d 610, 582

N.Y.S.2d 218, 219 (N.Y.App.Div.1992) (internal citation omitted).)
Sterling's complaint alleges that it relied on BNYM's
misrepresentations and omissions of material fact "in both
purchasing the Certificate Tranches and in deciding when to sell or
not to sell the Certificate Tranches." (Compl. ¶ 69; see also id.
at ¶¶ 19-20 (alleging that the defendants did not "make any
amendment or correction to the Prospectus Supplement informing
potential purchasers" that SPS and BNYM were neglecting their
duties under the PSAs)). "[W]here a claim for breach of fiduciary
duty is based upon a 'significant component' of the representations
that induced plaintiff to invest, the claim arises from the alleged
securities fraud and is preempted by the Martin Act." See Hecht v.
Andover Assoc. Mgmt. Corp., No. 006100/09, 2010 WL 1254546, *10
(N.Y. Sup. March 12, 2010) (quoting Heller v. Golden Capital, 590
F.Supp.2d 603, 612 (S.D.N.Y. 2008).) Judged by that standard
Sterling's claim for breach of fiduciary duty is clearly barred.
However, Sterling requests leave to amend its complaint to remove
the allegations concerning its decision to purchase the securities,
stating that it used its complaint in Sterling I as a template for
this case and neglected to delete those allegations. (Pl.'s Reply
in Supp. of its Mot. for Leave to File Supp. Authority at 3-4.) As
defendants point out, Sterling's allegations about the Prospectus
Supplement are surplusage. (See Defs.' Mem. at 5 n.4.) Its claims
are instead based upon the PSAs and certain obligations imposed
upon indenture trustees by the common law. Those claims are

unrelated to "the distribution, exchange, sale and purchase of securities." Castellano, 257 F.3d at 190. Provided that Sterling amends its complaint as discussed above, we conclude that the Martin Act does not bar its claim for breach of fiduciary duty.

Defendants also contend that Sterling's complaint fails to allege the existence of a fiduciary duty owed by BNYM. Indenture trustees are held to a different standard than trustees in other contexts. See Meckel v. Continental Resources, 758 F.2d 811, 816 (2d Cir. 1985). Prior to an event of default the indenture trustee's duties are defined solely respect to the indenture (or in this case, the PSAs), with two exceptions: (1) the trustee must avoid conflicts of interest;[6] and (2) the trustee may be liable for failing to perform basic non-discretionary ministerial tasks with due care. See Elliott, 838 F.2d at 71 (2d Cir. 1988); Peak Partners, 191 Fed.Appx. at 122. After an event of default the trustee's duties are more akin to those imposed on traditional trustees. Peak Partners, 191 Fed.Appx. at 122 ("It is only after an 'event of default' occurs, as that term is defined in the Indenture, that an Indenture Trustee's duty to noteholders becomes more like that of a traditional trustee."); see also (PSA (2002-24) § 9.01). Sterling does not specifically allege any Event of Default, but it contends that its allegations with respect to SPS "implicate" § 8.01(b):

---

[6] We have already concluded that Sterling's complaint fails to allege a "clear possibility" of a conflict of interest distinct from the BNYM's status as trustee under the PSAs. (See *supra* Part B.)

"Event of Default", wherever used herein, and as to each Servicer or the Master Servicer, means any one of the following events . . .:

[. . .]

(b) any failure by the Master Servicer or the Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer or the Servicer contained in this Agreement (except as set forth in (c) and (g) below) which failure (i) materially affects the rights of the Certificateholders and (ii) shall continue unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Master Servicer or the Servicer by the Trust Administrator or the Depositor, or to the Master Servicer or the Servicer and the Trust Administrator by the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates.

(PSA (2002-24) § 8.01(b).)  Sterling has not alleged that SPS's alleged failings remained unremedied for 60 days after it received notice in the manner prescribed by the PSAs.  We conclude, then, that Sterling's claim for breach of fiduciary duty cannot be based upon BNYM's post-default duties.  See, e.g., Dresner Co. Profit Sharing Plan v. First Fidelity Bank, N.A., New Jersey, No. 95 Civ. 1924 (MBM), 1996 WL 694345, *5 (S.D.N.Y. Dec. 4, 1996).

Sterling argues alternatively that Count VII should be construed to allege that BNYM breached its duty to perform ministerial tasks with due care.  (Pl.'s Resp. at 20.)  Defendants insist that Sterling is simply repackaging its claim for breach of § 4.04 as a tort claim.  We conclude that Sterling has alleged distinct claims.  Section 4.04 requires BNYM to provide certificateholders with certain information about the mortgage loans.  Sterling argues BNYM has an implied duty to perform that

ministerial task with due care. That includes the duty, not specifically set forth in the PSAs, "to inquire as to whether the information provided by SPS [about the mortgage loans] is complete." (Pl.'s Resp. at 22.) Construing the complaint liberally, we conclude that Count VII sufficiently alleges that BNYM breached its duty to perform non-discretionary ministerial tasks with due care.[7]

### 3. Damages

This leaves the question of damages, a necessary element of Sterling's claims for breach of contract and breach of fiduciary duty. See Robert I. Gluck, M.D., LLC v. Kenneth M. Kamler, M.D., LLC, 74 A.D.3d 1167, 1167 (N.Y. Supp. 2010)(fiduciary duty); Flomenbaum v. New York University, 71 A.D.3d 80, 91 (N.Y. Supp. 2009) (breach of contract). Defendants contend that Sterling's claims are based on an increased risk that at some point in the future Sterling will not receive payments of principal and interest on the certificates. This is a fair reading of the complaint as currently drafted. Sterling alleges that defendants' actions caused "credit support" to diminish, and that ratings agencies — presumably in response to diminished credit support — revised their assessment of the certificates' default risk. (Compl. ¶¶ 15 n.4, 21-22.) Sterling then claims that it was "damaged," without alleging that it has failed to receive any payment it is owed as a

---

[7] Whether BNYM's alleged obligation to request information is truly "non-discretionary" is beyond the scope of a motion to dismiss. (Cf. Defs.' Reply at n. 11.)

certificateholder. Rather than meet defendants' argument head-on, Sterling's response suggests alternative ways in which defendants' actions have caused concrete, present injuries. (Pl.'s Resp. at 10-11, 23-24 (citing illiquidity, increased capital reserve requirements, and increased FDIC premiums).) We believe that defendants' substantive objections to Sterling's arguments stray too far into the merits of Sterling's claims. (<u>See</u> Defs.' Reply at 14-15; <u>see also</u> <u>id.</u> at n.12.) For our purposes, it is enough that Sterling's complaint does not mention or even allude to the damages it claims in its response to the defendants' motion to dismiss. <u>See</u> <u>Thomason v. Nachtrieb</u>, 888 F.2d 1202, 1205 (7th Cir. 1989) ("It is a basic principle that the complaint may not be amended by the briefs in opposition to a motion to dismiss."). Counts V, VI, and VII are dismissed without prejudice for failure to allege non-speculative damages. <u>See, e.g.</u>, <u>Ravenswood Center, LLC v. Federal Deposit Ins. Corp.</u>, No. 10 C 1064, 2010 WL 2681312, *3 (N.D. Ill. July 6, 2010).

## **CONCLUSION**

Defendants' motion to dismiss (27) is granted and Sterling's complaint is dismissed without prejudice. Sterling is given leave to file an amended complaint by September 17, 2010 that cures the deficiencies we have identified, if it can do so. If Sterling chooses not to file an amended complaint by that date, the case will be dismissed with prejudice.

DATE:     August 20, 2010

ENTER:    _____

          John F. Grady, United States District Judge